All right, our third case this morning is 24-7049 Edwards v. Witherspoon. Mr. Longley. Good morning, Your Honors, and may it please the Court. Joseph Longley for Appellant Tracey Edwards. I'll be covering the issues regarding medications for opioid use disorder, while my colleague Shana Cotter will be covering the issues around shackling. Defendants in this case forcibly removed Ms. Edwards from the only effective medication for her opioid use disorder, buprenorphine, one of three FDA-approved medications for opioid use disorder. They didn't do this because of her individual medical needs. They did this pursuant to a blanket policy that said no matter how severe your opioid use disorder, no matter what your medical needs are, you will not be getting medications for opioid use disorder unless you are pregnant. This caused great harm to Ms. Edwards. Ms. Edwards described the pain that she experienced as worse than the pain that she experienced in the childbirth that she had just gone through. This happened immediately postpartum, and it left her at a severely increased risk of relapse, overdose, and death. This conduct violated both the Eighth Amendment and the Americans with Disabilities Act. As this Court has held in Gordon and Delanta 1 and 2, a blanket policy based not on someone's individual medical needs, but rather on administrative convenience with some other non-medical factor, can amount to deliberate indifference, and here it does. Here Ms. Edwards was subjected to this ban and was not allowed to stay on this life-saving medication. So you don't believe, you don't think that oxycodone taper was sufficient for purposes of, under the Eighth Amendment, I guess, a deliberate indifference claim? No, Your Honor. I think a reasonable jury could conclude that oxycodone was not sufficient. In fact, oxycodone was the very medication that caused her addiction in the first place. It's not FDA-approved or medically appropriate to provide oxycodone to somebody with opioid use disorder. It's not treatment for opioid use disorder. It's also not treatment for tapering from medications for opioid use disorder. Counselor, can I ask you about that? So that sounds like a pretty good negligence claim, but how is that deliberate indifference? Or I suppose you have an ADA claim as well, but with respect to your Eighth Amendment claim, how does that amount to deliberate indifference? Well, it's deliberate indifference because it doesn't have anything to do with her individual medical needs. Now, if this were the case where Ms. Edwards got an individualized evaluation and a doctor determined that medications for opioid use disorder were not medically necessary for her, then that would be a negligence case. But here, she didn't receive an individualized analysis of her individual medical needs. Instead, she was subjected to a blanket policy that no matter how severe the opioid use disorder, you can't get access to this medication. And so that's a categorical ban that doesn't amount to negligence. Right. But I guess that might be a better case if they provided nothing, but someone prescribed this alternative medication, oxycodone, as a taper, even though you disagree that it actually was. So again, why isn't that simply negligence? Well, it's not negligence, honestly, because a jury could conclude that that wasn't treatment at all. Again, there's record evidence from Dr. Allison Stube. But that is treatment. It's not the treatment that she might have preferred, or the treatment you think would have been ideal, but it's a treatment of sorts. It actually exacerbates her condition. And again, that sounds like a great negligence claim, but this is not a case where they denied her everything or gave her nothing. Well, Your Honor, if this was another medical condition, for example, diabetes, and she was provided insulin just during her pregnancy, and then for nine days, she received a medication that's not approved to treat insulin, that would amount to deliberate by providing a completely non-responsive medication, not based on what is her individual medical needs, but rather based on a blanket policy that has nothing to do with the actual clinical criteria for opioid use disorder. And it's not a treatment for opioid use disorder. So Elisabelle truly could come to that conclusion. And to conclude otherwise, this court would have to find that Elisabelle truly could not. For the Americans with Disabilities Act, and I'll add to that, Your Honor, as well, that in Gordon, this court found that despite the fact that they were providing monitoring, that that was not enough to defeat an Eighth Amendment claim. In Delonta, they were providing Prozac. In Delonta II, they were providing hormone therapy and allowing Ms. Delonta to dress as the gender that aligns with her gender identity. And the court found that just because there was some treatment, that doesn't amount to defeat her deliberate indifference claim. And so in this court as well, this court would not be breaking new ground in the Eighth Amendment context to say that Elisabelle truly could find that oxycodone was not sufficient. As far as the... You were about to talk about the ADA claim, and I'll ask you about that. So maybe I've just forgotten, but this is the first time that I recall an ADA claim being aired up with a deliberate indifference claim under the Eighth Amendment that I've been on the panel on. And again, opioid addiction is in fact a disability, so that doesn't seem to be an issue. But is that the line of demarcation? It has to be either a concession or a finding of disability before the ADA kicks in. Otherwise, you're just left with an Eighth Amendment claim. Is that right? Correct. There needs to be a disability and that disability is opioid use disorder. A disability is an impairment that substantially limits one or more major life activities. And Ms. Edwards meets that standard abundantly with the evidence that she's provided about the impact that opioid use disorder has had on her life. And in fact, I don't think that your friend on the other side says otherwise. Correct. It's undisputed in this court that opioid use disorder is a disability. Okay. And by categorizing people with opioid use disorder through differential treatment than people with other conditions, the NCCIW violated Ms. Edwards' rights under the Americans with Disabilities Act by failing to provide individualized assessments of her medical needs. And so that amounts to disability discrimination, which courts around the country, including a district court in this circuit, have found in virtually identical circumstances. The U.S. Department of Justice has also put out guidance saying that the categorical ban of medications for opioid use disorder amounts to disability discrimination under the Americans with Disabilities Act. And so here there's no question that she was subjected to this blanket policy and that that singles out individuals with opioid use disorder through differential treatment than, for example, the example that I gave Chief Judge Diaz, people with diabetes. So that amounts to an Americans with Disabilities Act claim. Additionally, defendants raised qualified immunity defense under the Eighth Amendment, but this court in Sinto v. Stansbury, as well as in Eco v. Shreve, has held that the relevant right is the right to adequate medical care. And as we've been discussing, there's an abundance of evidence for a jury to conclude that there was no adequate medical care for Ms. Edwards. That's based on the Estelle v. Gamble Supreme Court decision in the 1970s, which of course predates the issues at conduct in the issue here. The court has no further questions. I'm happy to hand it to my co-counsel. Thank you very much, counsel. Ms. Gater or Kadar, I hope one of those options is correct. It's Cotter, in fact. Thank you, Your Honor. Oh, 0 for 2. Oh my gosh. I'm so sorry. It's not an easy one. Well, good morning and may it please the court. Shana Cotter, also on behalf of the appellant, Tracey Edwards. I'm addressing her Eighth Amendment shackling claims. At the hands of NCCIW officers, Tracey Edwards was shackled to the hospital bed by one arm and one leg while she was, quote, experiencing very powerful contractions until she was instructed to push to deliver her baby. And then again, within an hour of delivering birth, exposing her to severe psychological harm and causing severe pain. Ms. Edwards was not a security risk. The district court erred in finding that the individuals responsible for this dangerous and degrading conduct are entitled to qualified immunity for two reasons. First, because Ms. Edwards' right to be free from dangerous and degrading shackling with no penological justification was clearly established by the Supreme Court's decision in Hope v. Peltzer. It was further clearly established by the decisions of the 6th, 8th, and 9th circuits who had unanimously held that shackling a person during this extraordinarily vulnerable time violates the Eighth Amendment. Second, the district court erred because the defendant's mental states remain in issue in accordance with this court's decision in Thorpe and its progeny. Given the open and obvious risk of harm attendant to shackling around childbirth, as well as the evidence in the record that defendants were aware of the state policy prohibiting the very practices in which they engaged, a jury could conclude that the defendants knew that they were engaging in conduct that rises to the level of an Eighth Amendment violation. This is enough... Counsel, wasn't the... I'm sorry to interrupt you, but didn't the record indicate that there was there was sort of a contradiction in policies that might have led an officer to be confused or at least not fully understand where the limits were? Yes, the record does include a... reflect policies that contradict one another, and I think the impact of those Witherspoon, the warden, as to the remainder of the defendants. The record reflects that the state had a policy that prohibited shackling during labor, when being transported for labor and delivery, after the induction line is being placed, prohibiting waste restraints, returning to a facility. So that's the state policy. It's located at JA 504, clearly prohibiting the conduct in which the defendants engage. Now there are also two NCCIW policies. Those were promulgated by the warden, Warden Witherspoon. It was brought to her attention multiple times that her policies were not in compliance with the state policy. So as to Warden Witherspoon, we think it's very clear. A jury could easily conclude that based on the fact that she ignored these directives from the state to conform her policies, that she was aware of the harm and risk of harm that was attendant to the practices that she essentially permitted under her watch. That's sufficient to show deliberate indifference on her part. As to the officers, there's really a conflict in the record as to what they knew and what they understood. Each of the officers avert, we followed all the policies, I knew of all the policies and I followed them all the time. But it's not possible. The policies are in conflict. And so it's not possible to have followed all of the policies at all the times. And the officer defendants state that they were aware of the state policy that was prohibiting the very conduct in which they engaged. I'm not sure how that helps you. They say they follow the policies all the time but the policies were hopelessly in conflict. Because... How does that indicate that that's an officer acting with deliberate indifference? So one... Intentionally. I apologize for interrupting. Go ahead. So one, your honor, as to the officers, so there are both the policies, the deliberate, the state of mind can be inferred both from their knowledge of a policy that prohibits this dangerous and degrading act of shackling. And then also from the fact they actually were applying restraints to Ms. Edwards' body during these extremely vulnerable times. So while she was in the hospital bed, hooked up to medical equipment, experiencing very powerful contractions. And the 6th, 8th, and 9th circuits have all said this is an open and obvious risk. And this offends, it's incompatible with contemporary standards of decency. The medical risks and the psychological risks that are attended to this practice are well known. They're also laid out in the declaration of Dr. Stube. But if I could direct the court's attention to the reasoning in the 8th circuit's decision in Nelson really lays out, that's the first circuit to weigh in on shackling around childbirth, weighs in on both why the harm was open and obvious and why the Supreme Court's decision in Hope establishes the right of issue here. See, that's the... All right. Thank you very much. Thank you. Ms. McHenry. May it please the court. My name is Laura McHenry and I represent the defendants at police. This court should affirm the order granting summary judgment for defendants for two reasons. First, plaintiff simply has not put forth evidence to satisfy the elements of her disability discrimination claims. And second, the record evidence fails to demonstrate that any defendant acted with a conscious disregard for a known risk of harm. Before I get into those reasons in more detail, I do want to emphasize that summary judgment is appropriate in this case. While there's some variance in the party's recitation of the facts, the material facts are not in dispute. This case can and should be resolved as a matter of law. Plaintiff asserts that the discontinuation of MOUD after she had her baby violates the ADA and the Rehabilitation Act. But this claim fails because she has not shown that she qualified for MOUD after she had her baby or that she was denied OUD because of her disability. As the court acknowledged with my friend on the other side, defendants do not contest that opioid use disorder is a disability under the ADA and the Rehabilitation Act. However, where our agreement sort of splits there is on the second and third elements. The second element of her ADA claim... But you would agree that the district court did its analysis based on pregnancy being a disability and not the opioid disorder being a disability? I'm sorry, can you repeat your question? Would you agree that the district court did its analysis based on pregnancy, not on the opioid disorder? I do not agree with that, Your Honor. To me, a plain reading of the order, of the district court's order, demonstrates that the district court clearly understood opioid use disorder as the disability underlying her ADA claim. And the reason for that is because, one, pregnancy is not a disability under the ADA. But it appears that the analysis about a district court is based on the use of being pregnant and not being pregnant, is what the district court did, not disability independent of the pregnancy. How I read that portion of the district court's order, Your Honor, respectfully, is really more tied to that second prong about whether she qualified. Plaintiff argues that she was removed, that the defendants discontinued MOUD after she was pregnant, and that that in itself shows disability discrimination based on her opioid use disorder. That logic doesn't follow because the reason she was denied MOUD after she had her baby is not because she didn't have the disability of OUD, it was because she was no longer pregnant. The reason that MOUD was offered for pregnant inmates and not non-pregnant inmates... I'm sorry, counsel. Yes, Your Honor. But that's sort of circular and also nonsensical. How is that a rational policy that someone who's under a disability because of addiction and is receiving what everybody seems to conceive as the appropriate treatment during pregnancy, all of a sudden she's no longer... She's somewhat less addicted and therefore is not entitled to the same treatment after she gives birth? That doesn't make any sense. I would agree that would not make sense, but that's not the reasoning. Let me try to rephrase the defendant's position there. I think Richardson v. Clark, a decision out of this court in 2022, is instructive. The issue in Richardson v. Clark was about at least the ADA claims, about an individual, an inmate who had been receiving in-person ASL interpretation. During COVID, defendants could not offer him that service, but were able to provide him with video calls with an ASL interpreter, as well as several assistive devices to help with communication and for reading. This court affirmed summary judgment for defendants, holding that the accommodations provided were reasonable and that plaintiff is not entitled to receive the specific accommodation that he requested, even if defendants were previously able to provide it. In this court's order, in this court's decision affirming summary judgment, they explain that context matters. This is important in this case, particularly. In Richardson, this court held that our context is a prison. We view the reasonableness of accommodations through the lens of operating a prison, and that vantage point requires some deference to those who run prisons. The ADA just does not require prisons to employ any and all means to make services available to persons with disabilities. That's from page 621 of it. Well, but I suppose you could read Richardson as indicating that even though those alternative services may not have been the catalog option when it came to options, it was at least a reasonable alternative, and even if not the perfect one, in the prison context, entirely appropriate. But here, I mean, your colleague on the other side says that the Ms. Edwards in this case was actually no treatment at all. I mean, it was just not, it was exactly the same drug that caused her addiction to begin with. Isn't that a difference that matters? That, that's simply not accurate. It wasn't that she... Well, what's the evidence, what's the evidence that this treatment that was offered was in fact a viable option? All the record evidence, at least with respect to experts, say that that's entirely contraindicated. There's no universe in which this is appropriate. So to point me in the record to where that, you say otherwise, or someone says otherwise. Sure, on pages 744 to 745 of the Joint Appendix, the defendants lay out the reasons why, the compelling reasons that NCCIW could not offer MOUD to non-pregnant patients back in 2019. Some of those include limitations on licensure and prescribing authority that were beyond their control. So specific to your earlier question, your honor, NCCIW was not licensed as a drug treatment center in 2019. Instead, the reason they were authorized, some of the physicians that were authorized to provide opioid replacement medication to pregnant inmates was to treat their pregnancy because removal of that, discontinuation of that medication during pregnancy led to a high risk of fetal loss. So the provision of treatment during pregnancy was related to treating the pregnancy. Once inmates were no longer pregnant, the facility, NCCIW, did not have licensing or prescribing authority to treat opioid use disorder. Now, I will point out, your honor, that in the plaintiff's briefing, they rely on a number of sources that post-date the facts that gave rise to this claim. So in 2024, SAMHSA says, yes, this is the standard of care. In 2025, there's a USDOJ article that says, this is the only type of treatment that we recommend for opioid use disorder. But the ADA does not require defendants to see into the future and understand what is going to be commonly accepted in 2024, 2025, five, six years later, after the incidents took place. In 2019, we had compelling reasons not to provide MOUD to non-pregnant inmates. So in addition to the licensure and prescribing authorities, we have a serious issue- I'm sorry to interrupt you, Ms. McHenry. So I hear you saying that the reason why the treatment could not be provided was there weren't qualified staff, a lack of resources, essentially, is what you're saying. Is there a case that says that that's a viable reason in this context to deny a claim that alleges an ADA violation and or deliberate indifference? The prison simply can't provide the treatment because it lacks the resources to do that. A number of cases, Your Honor, would stand for the proposition that prisons, in particular Richardson, are not required to offer any service that is, you know, the specific medical care that a patient requests. But in addition to those licensure and prescribing limitations I talked about, we have serious issues of diversion, which were common in the carceral setting. As evidenced by at least two incidents in this record where the plaintiff diverted opioid replacement medications while incarcerated at NCCIW. On JA 3408, plaintiff admitted that she bought Suboxone from another inmate. And on page 3246, there's a note that she was caught hiding Suboxone in her bra during a search. So, like in Richardson, we have to keep in mind that context matters, that the ADA does not require prisons to employ any and all means to make specific services available to patients in their custody, nor does the ADA require prisons to create new programs or initiate new services that are, at that time, not available to non-pregnant offenders, simply because that's plaintiff's preferred treatment. And even the Smith v. Roostook, which is a district court decision, the plaintiff relies on acknowledge this reality. On page 151 of that decision, the district court explained that there's only a limited number of facilities in the United States that have programs in place to routinely provide this medication to inmates. And the reason for this, the district court relied on the plaintiff's expert in coming to this conclusion, that in 2019, opioid replacement medications were seen as drugs, not medicine. And the opioid replacement medications were sought after contraband in correctional facilities, and that it did not make sense to introduce these drugs into the carceral setting. There are other cases, Cartagena, Horton, that I think would also support the defendants, that, not I think, that absolutely do support the defendants' position that plaintiff simply did not qualify for continued MOUD after she was no longer pregnant. But I do, with my remaining time, want to make sure that I get to the Eighth Amendment claims that plaintiff has raised as well. With respect to her Eighth Amendment claim about discontinuation of MOUD, she has to demonstrate that defendants acted with deliberate indifference. That is, that defendants consciously disregarded an objectively serious risk of harm. And the plaintiff simply has not met this high bar that the Eighth Amendment requires. Well, you made it sort of easy in this case, didn't you? You gave no individualized assessment in terms of stopping it. That's one thing. You just did it. You're not pregnant, you don't get it. You didn't say, well, you know, we looked at this case, and here we think that this, that's kind of deliberately indifference where, you know, you can almost turn your head and say, OK, you're no longer pregnant. Let's flip the switch. You don't get it. Isn't that the same thing? Isn't that, that's what, that's the essence of indifference is, isn't it? I would disagree, Your Honor. Well, I would say, I would perhaps agree with your characterization, but I disagree with the plaintiff's-  Characterization. Oh, I see. I apologize. No, no, no, no, no. No, Your Honor, what I, I guess what I'm- But it's not a characterization. I think that's a pretty good denotative definition of indifference, the lack of making a difference. And that's what it is. Saying, look, you know I'm not pregnant, you don't get it. That's why I say, isn't that the height of indifference? Period, without saying, well, you know, you're still in postpartum, doesn't matter, you're still dealing with that. There's a lot of chemical changes for a woman, you know, I never had a child, but I had three girls, thank God, born and experiencing that. There's a lot of difference in terms of what goes on in chemistry and makeup, and we find out more and more about postpartum and those things that are very important. And just to say, no, you're no longer pregnant, you don't get it. Why is that not indifference? Because while plaintiff didn't receive the treatment that she desired, or even the treatment that she says- Not desire, desire some more. Well, you know, I take this one, this one. That's opioid addiction, our country is just serious, I mean, it's just ravishing. You know, it's just documented in books and reference journals. It's not a matter of what she desires, like she was trying to get a multiple choice, it's what she needed. And I don't think you can dispute that, do you? The opioid addiction existed, it didn't stop when she was pregnant, right? Do you agree with that? That's right. All right. Your Honor, I think that where we diverge is that in 2019, we didn't have a safe, or even we didn't have the authority, the legal authority to offer the specific medical care that she requested, which was MOUD. Now, today we've talked about, and in plaintiff's briefing, they talk about the standard of care, which we can now maybe accept that that is the standard of care for somebody with opioid use disorder. But the standard of care does not mean that it's the only acceptable care that you can use to treat a particular patient. The standard of care is a tool that clinicians use when they are assessing- Isn't it counterintuitive to say that, well, that the very drug that caused your addiction, that's what I'm going to give you to treat you. Oxycodone. Those kind of drugs. Well, oxycodone is an opioid agonist. And the reason that was given is because they have prescribing authority for oxycodone. They did not have prescribing authority for suboxone, which was the- After she was no longer pregnant, did you? Yes, that's correct. They did not have licensing authority to prescribe MOUD to non-pregnant patients because they were not a drug treatment center. And who dictated that? The DEA and the North Carolina Department of Health and Human Services. The DEA said that you couldn't give MOUD to a person who still needed it. They were not- That's in their record, right? Yes, Your Honor. And it said you cannot do this. You had to lock it up. So in other words, if you had no pregnant inmates, then what do you do? You just throw all that away or just don't give it? At the time, those individuals would be tapered off of opioid medications. Now, I want to draw a distinction here to compare the facts we have here with an example like Bronner v. Scott, which was in the Sixth Circuit. It was a 2021 case where the inmate came in with three prescriptions, one of which was for MOUD. Two others were not related. She was denied all three of those prescriptions upon intake, and she suffered roughly 30 seizures. She was hospitalized, and they still never gave her any of her medications, nor did they develop an alternative treatment plan. That's what deliberate indifference looks like. Here, we have a different situation. They were limitations on the provision of MOUD in the carceral setting. They did not send her to her cell to suffer withdrawal alone. She was put in the Robin Unit, which is the sort of in-house medical unit within NCCIW. She was offered a tapered dose of opioid medication where every three days it was reduced. She was supervised 24-7 by medical staff. Her symptoms, as they presented, were treated. This is all in the record. That's where I think we disagree on deliberate indifference. It may not have been the care that she would have received out in the community, but within the parameters of what NCCIW could do at the time, the defendants did not act with deliberate indifference. They did not act with a conscious disregard of a known risk to harm. Well, let's talk about the shackling then.  Isn't it obvious and open that shackling a pregnant woman would be that there may be some constitutional deficiency there? Today, sitting here, Your Honor, I think we are living in a different reality than in 2019. I mean, it's interesting because everyone's talking about 2019, but I think it's 2018. Even in your, if you look at JA 513, even in your standard operating procedures, when it discusses offender restraints, and this was issued in February of 19, in the SOP, it says that restraints should be basically used on all offenders except, and it goes to, I think it's 0.1802B3, pregnant offenders in active labor, right? Correct, Your Honor. So that's 2018. Then in April of, I mean, February 2019, April of 2019, Ms. Witherspoon has a conversation with the regional manager regarding shackling pregnant women. And then in November, on November 22nd of 2019, there's this directive, this email, a directive comes out, and then there's an email from Witherspoon, basically acknowledging the directive, which she emails Thornton. I think she was on leave or something regarding the directive regarding shackling pregnant women. And then on November 23rd, Ms. Thornton sends an email to the OICs, I assume this is the officers in charge, and says, once again, you have this discussion about shackling pregnant inmates. And then Ms. Edwards in December is transported to the hospital at UNC Chapel Hill. She's shackled. I think there's evidence in the record that says she was shackled at some point during her contractions. She's taken to the hospital for inducement, correct? That's correct, Your Honor. So they induce her, and she's shackled while she's having contractions. She does allege that, yes, Your Honor. Which would be active labor, right? Yes, active labor under the policy is defined as the onset of contractions. All right. And so I just don't understand how that's not obviously constitutional deficient, based on as far back as February of 2019, all of these different policies are saying you cannot shackle a pregnant woman, even during active labor, in transportation, in the last trimester. How is that not obviously constitutionally deficient? And I'm asking about Thor, is the real reason why I'm asking you that. Thor v. Clark. Yes, in terms of deliberate indifference. Sure. Chief Judge, I see that my time is up. May I respond to Judge Benjamin's question? Absolutely. Thank you. In Thor, there's an important distinction procedurally. In Thor, this court found that the dismissal of the Eighth Amendment claim was improper, because we were at the 12 v. 6 stage. We're now, I think it's critical that we're now at the summary judgment stage. We have a full record that's been developed. We're not just looking at the plaintiff's allegations that we accept as true. However, here, on summary judgment, the plaintiff has pointed, has emphasized issues with the policies, right? And that there's some, perhaps, inconsistencies between state policy and NCCIW's policy. I argue, on the one hand, that some of the citations to the NCCIW policy look at the use of restraints on all offenders, versus the modifications that are there for pregnant offenders. But even putting that aside, it's well-established that a policy violation does not equate to a constitutional violation. The district court correctly found that defendants... But for purposes of deliberate indifference, under the Eighth Amendment, they're on notice. The question is, did she know what they were doing was wrong, right? Did they consciously disregard a known risk of harm? Yes, that's the question. All right. And so here, we have all of these policies, emails from Witherspoon to other staff members, conversations. I'm not sure, how did she get around the knowledge portion of that? Ultimately, Your Honor, I think what we have to remember is that all of these policies, and each of the defendants' individual acts, every correctional officer involved in this case, and any time they're in a correctional facility, is to balance individual dignity with community safety. So any time they're removing an inmate from the secure confines of the correctional facility and taking them out into a non-secure facility, like a courtroom or like a hospital, they have to balance safety and the general requirement that we have to prevent escape, we have to prevent harm, we have to protect the inmate themselves. Was there any evidence in the record of her, that you all were concerned regarding her risk of harm or escape? There's no evidence in the record that with this particular plaintiff, we had that harm. But Your Honor, the point I'm trying to make is that the defendants here are constantly battling with that tension, and that they're trying to balance that individual dignity for the plaintiff and the requirement that they keep both inmates and all the staff, especially when they're outside of the secure correctional facility. Yes, because the policy says that is one of the things that you all have to consider in determining if there is a risk of escape or risk of harm. So that's why I asked the question, was there any determination that she was at risk of hurting herself or someone else, or escaping during the transportation while she's in the hospital? That would lead you all to shackle her during active labor. There's nothing in the record that indicates that, Your Honor. If I may just conclude with one statement, I know I'm far past my time here, thank you. The plaintiff cannot point to a single decision in this circuit or by the United States Supreme Court showing that an inmate has a constitutional right to be free of restraints when outside the confines of a secure facility, even pregnant inmates. And so in this case, the district court was correct in granting summary judgment on qualified immunity grounds for the defendants. Defendants respectfully ask that you affirm the lower court's decision. Thank you very much. All right. Thank you, counsel. Mr. Longden. May it please the court, a few points in rebuttal. First, defendants point to a number of fact issues here, but that's entirely the point, is that there are genuine issues of material facts. For example, they point to the alleged lack of authorization to be able to provide MOUD after Ms. Edwards gave birth. Now, we allege, and we have shown evidence that the citations that they're pointing to are citations about methadone, which is not the medication that she was on. The regulations were about, the facility was allowed to prescribe buprenorphine because they had, it's undisputed, they had ex-WAYLUDE providers on staff, which is what was required to be able to dispense and prescribe buprenorphine in 2019. They also ignore that if they couldn't have provided it in-house, they could have taken her off-site to be able to receive her medication for opioid use disorder, like they did for six months. It was only a few days that they provided MOUD in-house, which they did do in December of 2019. Secondly, they allege issues with safety. And the safety incidents that they point to happened after she was already taken off of MOUD. And this court in Sinto allowed an Eighth Amendment claim to move forward to a trial where there were alleged safety concerns with an individual who was diabetic and was denied insulin because of threatening behavior. So that is not a total defense to someone's rights under the Eighth Amendment and the Americans with Disabilities Act. I'm going to ask you, you've indicated, I think, you've made a good point about there being fact issues here that might preclude summary judgment, but is there a case that suggests that a prison that lacks the resources sufficient to adequately constitutionally treat an inmate, that that's a free pass for the facility if they say and throw up their hands and say they just can't provide that treatment? No, Your Honor, and time and time again, this court has found that administrative barriers are not an excuse for deficient medical care under the Constitution. And this court in Gordon and Delanto 1 and 2 rejected those administrative barriers as valid defenses to liability under the Eighth Amendment. I see my time's expiring. If I could make one point about the qualification criteria under the ADA. Ms. Edwards is undisputed, was qualified for the program service or activity of prison medical care. And that's the appropriate lens to analyze her claim. And this court, defendants say that she was not qualified because the policy itself excludes her as long as she's not pregnant from receiving MOUD. But as Chief Judge Diaz's questions go to, that reasoning is circular. And this court in Limon warned against analyzing what the program service or activity is in a way that empties discrimination statutes of meaning. And that by defining the program at a level of generality that doesn't allow for the discrimination to be heard by the court, that that's error. And for those reasons, we ask that this court lose. All right, thank you very much. We have one more, Ms. Kadar. Thank you, Your Honor. A few points in rebuttal. So first, I'd like to just remind the court here that it's the defendant's burden to establish that the right at issue is not clearly established. That is, it's not the plaintiff's burden to show that the right is clearly established. And that's laid out by this court in the decision in Stanton. So even if that were not the case, there is a mountain of authority, a clear consensus between the courts, the prison policy, and third party organizations contending the practice of shackling around childbirth. So we contend the right is very clearly established. There's no contrary indication in the record. The defendants have pointed to nothing else. Two, there is no safety or security issue here. The defendants don't dispute that she was no security or flight risk. You can find that at JA 117 and 3057. That was an undisputed fact on summary judgment. Third, the principles in Thorpe, they apply beyond the motion to dismiss stage. This court has made it very clear. If there is still a question as to the officer's state of mind, even if that's on summary judgment, and even if that's after trial, the qualified immunity question cannot be decided until that's clarified. So in Coleman and in Fowler, that was on summary judgment where those Thorpe principles applied in the younger case after a jury trial. And finally, that there is still a factual issue that needs to be determined. As to the officers, there's a real question of fact on the state of mind. There's sworn testimony as to their policies doesn't make sense. There's no security risk. And it's up to a jury to determine what they believed when they applied the shackles to her swollen ankles and when she could not get up to care for her crying infant. And in the words of the Sixth Circuit in Villegas, the jury's responsibility for weighing conflicting evidence is especially crucial where the ultimate issue is one that draws upon community values. And we submit that that is exactly the case here and respectfully request that this court reverse the decision granting summary judgment below. Thank you. Thank you very much, counsel. I want to thank all of the counsel this still morning, I guess, for their fine arguments before the court. My colleagues will come down and greet you. And I also want to thank the cadets from VMI for being here with us this morning. I regret that I can't meet with you personally or online, but I understand my colleagues are going to meet with you after we conference the cases. So we will adjourn and my colleagues will come down and greet counsel. Then we'll come back and conference our cases. And then the judges, Benjamin and Gregory, will come down and speak with the cadets after we're done. So thank you very much. Madam Clerk. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Albert Diaz, Roger L. Gregory, DeAndrea Gist Benjamin